Emilio PACE, Plaintiff,

v.

PARIS MAINTENANCE COMPANY, Pembrook Management Company, Corporate Property Investors, and Joseph Galea, Defendants.

No. 98 Civ. 1470 RWS.

United States District Court, S.D. New York.

July 12, 2000.

---

Thomas S. Rosenthal, New York City, for plaintiff.

Milman & Heidecker, Lake Success, NY, for defendant Paris Maintenance Co., by Perry S. Heidecker, of counsel.

Kelley Drye & Warren, New York City, for defendants Pembrook Management Company, Corporate Property Investors and Joseph Galea, by Kenneth Kirschner, Stephen P. Goulet, of counsel.

## OPINION

SWEET, District Judge.

Defendants Corporate Property Investors ("CPI"), Pembrook Management Company ("Pembrook"), Joseph Galea ("Galea"), and Paris Maintenance Company ("Paris") (collectively, "Defendants") have moved, pursuant to Rule 56, Fed. R.Civ.P., for summary judgment to dismiss the complaint of Emilio Pace ("Pace"). For the reasons set forth below, the motion will be granted.

### The Parties

Pace is a former employee of Paris and of Pembrook. He resides in Brooklyn, New York.

Paris, Pembrook, and CPI are New York corporations with their principal places of business in Manhattan.

Galea is or was a Pembrook employee.

### Prior Proceedings

Pace filed his complaint on February 27, 1998 against Defendants, alleging unlawful employment discrimination and retaliation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (the "ADA"), New York Executive Law § 296, the Human Rights Law (the "NYHRL"), and the City of New York Administrative Code Title 8 (the "NYCHRL"). On November 6, 1998, Pace filed a supplemental complaint setting forth events which allegedly occurred subsequent to the filing of the original complaint. Discovery proceeded, and on December 23, 1999, Defendants filed the instant motion for summary judgment. Papers were received through April 21, 2000, at which point the Court heard oral argument and the motion was deemed fully briefed.

### Facts

The following facts are drawn from the parties' Rule 56.1 Statements and other submissions and, as required, are construed in the light most favorable to Pace, the non-movant. They do not constitute findings of fact by the Court.

The central facts of this case concern the circumstances under which Pace was removed from his occupation as a handyman at a commercial building located at 305 East 47th Street (the "Building") and subsequently shuffled around between several buildings where he worked as a handyman or janitor until he was injured in June 1998 and became disabled.

Pace was born in 1952. He has a General Equivalency Diploma and attended high school for a year. He worked at a gas station briefly, then was unemployed for a year. He delivered groceries for two years. For five or six years during his twenties, Pace was unemployed, during which time he had a substance and alcohol abuse problem; he suffered blackouts, drank excessively, and got high. The chief problem, however, was alcohol abuse. Eventually, he promised his mother that he would refrain from drinking. He subsequently participated in a Church of Scientology drug and alcohol purification program. While he did not obtain medical treatment for his alcohol abuse, his efforts were nevertheless successful: he has not had a drink in the past fifteen or twenty years.

Pace had several other jobs before he began working at the Building. He worked as a security guard and as a car-

penter's apprentice, and became a member of Local 32B/32J (the "Union").

Pace began working at the Building in August 1983. He was thirty years old at the time. His initial job at the Building was as a porter. He was promoted to handyman after two or three years. He remained a member of the Union.

Maintenance and janitorial services at commercial buildings in New York City are often provided by companies which contract with the owners or managers of such buildings to provide such services. Union members who work at a particular building, although employed by the maintenance services company, are entitled to remain at the building when a different maintenance services company takes over the contract. If a Union member is removed from a building, he or she may lodge a complaint with the Union, which can then bring a grievance procedure to reinstate the member to his or her job at the building. Salaries and benefits for members of the Union depend on seniority within the Union, but preference for vacation and holiday time off depends on seniority within a particular building, thus providing an incentive for working in a single building for a long period of time.

Pembrook managed the Building, and CPI either owned the Building at 47th Street or maintained offices there and was an alter ego/affiliate of Pembrook. Apparently, Pembrook also originally directly provided maintenance and janitorial services for the Building, and thus was Pace's direct employer for two years. 767 Fifth Avenue Management then took over the maintenance and janitorial services for the Building, and Pace became an employee of 767 Fifth Avenue Management for six or seven months. He was then employed by American Building Management for 12 or 13 years. After ABM, Pritchard took over maintenance and janitorial services at the Building for about eight months. Paris took over in 1996, pursuant to a contract between Paris and Pembrook. Pace never received a paycheck from CPI.

Paris was Pace's employer during the time period relevant to this litigation and paid the salary of, provided benefits for, and scheduled vacations for Pace from the summer of 1996 until June 1998. Paris also was responsible during this period for speaking to Pace about his daily activities, for handling his complaints and problems, and for disciplining him. Paris ultimately removed Pace from the Building at the request of CPI/Pembrook.

Prior to 1997, Pace habitually ate his breakfast on the job, cooked lunches, and took naps. Paris had no difficulty with Pace or with his ability to perform his job, nor is there any evidence to suggest that any prior employer ever had a problem with Pace. However, in February 1997, Galea was hired by Pembrook as the new Building Engineer. Galea, although an employee of Pembrook, thereby became Pace's immediate supervisor. Considerable friction arose between Galea and Pace. Galea told Pace he could no longer cook or take naps, sit down, or take tea breaks while working. Galea was also aggressive and regularly followed Pace around to make sure he was doing his job.

Galea was equally aggressive towards other employees who worked at the Building who did not have any history of substance abuse. For example, Nick Rizzo ("Rizzo") was in constant fear of Galea due to Galea's aggressive treatment of Rizzo. Like Pace, Rizzo was given tasks he did not have the expertise to perform and complete, and was chastised for taking breaks. In addition, night porters, the head of security, and Paris management was given a hard time by Galea. Pace complained to Paris management regarding Galea, as did other Paris employees. Paris told Pace to keep a diary of the incidents with Galea.

Ellen Weglarz ("Weglarz"), Paris's former office manager, described Galea as abusive, assaultive, vile and combative. Weglarz is not an alcoholic and was never accused of being an alcoholic by Galea.

In one incident (the "I–EEE Incident"), Pace responded to a call by a Building tenant, I–EEE, whose representative, Catherine Kemelmacher ("Kemelmacher"), had complained about the air temperature in her office. Pace had to ask Kemelmacher a couple of times for the name of the employee in I–EEE's office who was experiencing the temperature problem. Galea was standing behind Pace when the conversation took place. As Pace left to take care of the problem, Galea asked Kemelmacher, "Don't you know why Emilio forgets?" Kemelmacher asked why, and Galea responded that Pace "has a drinking problem, didn't you know that? He likes his booze, he likes his vino." Surprised, Kemelmacher responded "What?" Galea replied, "Oh sure, he's drunk even now." Galea then made a hand gesture as though he were tossing back a drink. Kemelmacher thought Galea was making a joke and the comments precipitated laughter among those who overheard them.

The tension between Pace and Galea did not dissipate, and on April 25, 1997, Pace filed a complaint with the Union, alleging that Galea was harassing him. On April 28, 1997, he filed a complaint with the City Commission on Human Rights ("CCHR"), alleging disability discrimination against Defendants on the basis of the I–EEE Incident. Defendants were aware soon thereafter that Pace had filed these complaints.

Galea was the only person at Pembrook or CPI who allegedly discriminated against Pace.

On May 20, 1997, Pace and Rizzo were working on removing a water pump from the bottom of the freight elevator in the Building. Pace believed this job was not part of his duties. Pace and Rizzo unhooked the pump, took it to the workshop, and put the elevator back in service. Pace was then assigned to go to the roof and attend to a fire extinguisher on the seventh floor. Pace recommended to Galea that the leaves in the elevator shaft be vacuumed with a Wetvac. Galea said it wasn't necessary because of the type of pump they had. Later that day, however, Galea asked Pace why he hadn't vacuumed up the leaves. Pace did not pass by the freight elevator at the end of the day on May 20, 1997.

The next day, May 21, 1997, Roger Finley ("Finley"), a security guard, asked Pace when he arrived at work who had used the freight elevator the previous night. Finley stated that the security log indicated that the freight elevator was left open and Anibel Munoz, the night supervisor, almost fell in. After the conversation, Pace went downstairs to put on his uniform. He then went back to the lobby where Galea, Finley, and a contractor from Lab Plumbing were assembled. Galea then asked Pace in a nice tone "what happened with the leaves last night?" Pace responded by yelling, "Joe, why did you leave the doors open?" According to Pace, "you could hear the building shake, that's how loud I screamed. I thought I busted my vocal cords ..." Galea was scared by this outburst and ran off without saying anything further. Later that morning, Pace had another confrontation with Galea. Galea asked Pace how long it would take him to vacuum the elevators. Pace responded, "Now, what's going on? All of a sudden I got a time limit on those jobs. What is going on?" Galea then told Pace he didn't want to deal with him anymore and that Pace should get his work assignments from a woman named Judy. Galea then told him to vacuum the leaves in the elevator shaft. Galea then had Judy request that Pace vacuum the leaves. Pace asked Judy if she knew what was going on. She told Pace that his actions constituted insubordination. Pace responded that he just wanted an Otis elevator representative present when he vacuumed the leaves but that he was not refusing to do the job.

Immediately thereafter, Pace called Paris and spoke to Susan Schmeltz. Pace described what had just happened. Schmeltz then told Pace that Janet Esposito ("Esposito"), Paris's Director of Opera-

tions, was not in. Schmeltz then told Pace to leave the Building, although it was 11:00 a.m. and Pace's shift did not end until 5:00 p.m.

That afternoon, Pace spoke with Weglarz, Paris's office manager. Weglarz informed Pace that Pembrook did not want him working in the Building any longer and that Paris would let Pace know when they figured out what to do with him. According to Weglarz, Paris had no choice but to honor Pembrook's request to remove Pace from the Building. According to Esposito, Galea made the call to Paris informing them that Pace could no longer work at the Building and that the security guards would not let him in if he showed up for work.

Pace had complained to Paris on numerous occasions about Galea, and had requested orally and in writing to leave the Building temporarily because of Galea.

On May 23, 1997, Paris placed Pace at 55 Water Street in Manhattan, another office building in which Paris provided cleaning and maintenance services. Paris paid Pace for the time between leaving the Building and commencing at 55 Water Street. Pace received the same wages at 55 Water Street that he had received at the Building. Apparently, Paris informed Pace that the new assignment would be on a trial basis. However, the assignment was actually on a temporary basis.

Barry Sanford ("Sanford"), Pace's successor at the Building, requested a transfer after less than two weeks due to Galea's aggressive behavior. Sanford had been the handyman at 55 Water Street and was described by Esposito as being accomplished and skilled, with considerable seniority. Sanford had for a long time been seeking a position with daytime hours, so when Galea had Pace removed from the Building, Paris transferred Sanford from 55 Water Street on a trial basis and had Pace fill in for Sanford at 55 Water Street on a temporary basis. Despite Sanford's eagerness for a day spot, however, it wasn't worth the attitude he was getting from Galea, who questioned Sanford's skills. Thus, Sanford returned to 55 Water Street and Paris had to find a different position for Pace.

Galea also asked that Ramon Torres ("Torres"), the Building's subsequent handyman, be removed. There is no evidence that either Sanford or Torres were alcoholics or had a history of alcohol or substance abuse.

In an effort to find work for Pace and to preserve his union seniority, Paris moved him around various buildings for which Paris had maintenance and janitorial services contracts as different handymen or janitors took vacations or were otherwise unable to work. Pace held successive jobs at Four New York, Metro Tech Center, North End Avenue, and back at 55 Water Street. He was paid the same rate at these jobs that he had received at the Building. While Pace apparently told Paris that his first preference was to return to the Building and that a second preference would be a permanent position at 55 Water Street, Paris determined that Pace was not qualified for a permanent position as a handyman at 55 Water Street, although he had performed a job with the same title for many years at the Building. This was because Pace did not pass a handyman's examination required by 55 Water Street.

On July 3, 1997, Pace filed a second complaint with the CCHR alleging retaliation by Defendants for removing Pace from the Building.

Pace also filed a grievance with the Union regarding his removal from the Building. In 1998, while Pace was working at the other buildings serviced by Paris, the Union processed his grievance to arbitration on his transfer from the Building to 55 Water Street. The issue in the arbitration was whether Paris violated the Union contract by transferring Pace and Munoz from the Building. The Arbitrator found Pace's grievance untimely and dismissed

his claim.[1] Afterwards, a Paris supervisor mistakenly told Pace that he was fired. The following day, Esposito called Pace and informed him that the supervisor had made a mistake. Pace did not lose any pay as a result of the mistake.

On one occasion during settlement negotiations regarding Pace's Union grievance, Pace met with Esposito and Mary Kartzian, a representative of the Union, at the Union's offices, to address Pace's issue of being removed from 55 Water Street. Esposito and Kartzian met without Pace for some time, then included Pace in the conversation. Pace wanted to be reinstated at 55 Water Street, but Kartzian told Pace to accept any job offered by Paris, because the Union would subsequently institute a grievance procedure to have Pace reinstated. Esposito explained to Pace that Paris could not keep Pace at 55 Water Street because he had not passed the handyman exam. Pace responded that he had taken the test. Esposito then said, "They only want qualified guys," and mentioned an incident involving a door knob and the building manager at 55 Water Street, George Saa. Pace responded that he didn't know what was going on, and, according to Pace, "one thing led to another, and I says, 'this harassment I'm not going to take no more.'" Esposito then said that "this is a federal case and you are costing us thousands of dollars."

Due to the ongoing Union grievance arbitration and Pace's stated preference to return to the Building, Paris did not attempt to find Pace a permanent position at another building but merely sought to keep Pace working. After the Union grievance arbitration was dismissed, and the prospects for Pace returning to the Building were eliminated, Paris sought a permanent position for Pace. Under Union rules, Pace, if he had been laid off from one building because of a reduction in workforce, would be entitled, because of his seniority, to bump the most-recently hired employee from one of Paris's other buildings. Paris attempted to use this provision to find Pace another job once the Union arbitration had terminated. This happened to be for a part-time porter position at a building on North End Avenue. Pace accepted this position and worked at North End Plaza for a few weeks until he was injured in June 1998. He subsequently applied for Social Security disability benefits. He has not worked or sought employment since his injury and has received worker's compensation benefits.

Pace does not believe, nor does any other evidence suggest, that his former alcoholism in any way affected his ability to perform his duties at the Building or limited him in any other way.

There is no evidence to suggest that Galea, Pembrook, or CPI were aware of Pace's former problems with alcohol abuse. Although Pace spoke about his past with Building employees Tom Scott, Arthur Leonard, and Carol Tasillo, Pace believes that these individuals would not have breached his confidence or shared this secret.

Galea has not been deposed in this case. He left the country soon after discovery commenced and has not yet returned.

Subsequent to Pace's removal from the Building, Paris resigned as its contractor for maintenance and cleaning services.

### Discussion

Pace has alleged that he was removed from the Building and not permitted to return because he was a recovering alcoholic or was perceived to be an alcoholic or recovering alcoholic, and in retaliation for his filing of a complaint with CCHR, in violation of the ADA, the NYHRL, and the NYCHRL. Defendants have moved for summary judgment on all of Pace's claims, maintaining that the undisputed material facts preclude Pace from prevailing as a matter of law.

---

1. Munoz was reinstated to his position at the Building.

## I. *The Standard for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ.*, 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evidence produced in the light most favorable to the non-movant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell*, 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991)).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985).

For a dispute to be genuine, there must be more than "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

Additional considerations factor into a summary judgment motion in an employment discrimination action. *See Gallo v. Prudential Residential Services, L.P.*, 22 F.3d 1219, 1224 (2d Cir.1994); *see also Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 103 (2d Cir.1989); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985). Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's documents, a trial court must be particularly cautious about granting summary judgment when the employer's intent is at issue. Affidavits and depositions must be scrutinized for circumstantial evidence which, if believed, would show discrimination. *See Gallo*, 22 F.3d at 1224. This does not suggest, however, that summary judgment is never appropriate in an employment discrimination action. The Second Circuit has made clear that the "impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable." *McLee v. Chrysler Corp.*, 38 F.3d 67, 68 (2d Cir.1994); *see Meiri*, 759 F.2d at 998.

Where no evidence exists or only conclusory allegations of discrimination have been offered to suggest that an employer's motives are improper, summary judgment may be appropriate. *See Meiri*, 759 F.2d at 998; *see also Woroski v. Nashua Corp.*, 31 F.3d 105, 109–10 (2d Cir.1994). After all, a party seeking to defeat a summary judgment motion cannot rely upon "conclusory allegations or denials," but rather must set forth "'concrete particulars'" showing that a trial is needed. *National Union Fire Ins. Co. v. Deloach*, 708 F.Supp. 1371, 1379 (S.D.N.Y.1989) (*quoting R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984)). Mere speculation or conjecture as to the true nature of facts cannot overcome the motion. *See Lipton v. Nature Co.*, 71 F.3d

464, 469 (2d Cir.1995); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986). The responding party "must show the existence of a disputed material fact in light of the substantive law." *Peer Int'l Corp. v. Luna Records, Inc.*, 887 F.Supp. 560, 564 (S.D.N.Y.1995). In the absence of any disputed material fact, summary judgment is appropriate.

## II. *The ADA Claims Will Be Dismissed*

The ADA prohibits covered employers from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

When considering discrimination claims brought under the ADA, courts in this circuit apply the burden-shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. *See Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 52 (2d Cir.1998). Under the *McDonnell Douglas* framework, a plaintiff "must initially come forward with facts sufficient to establish a prima facie case" of disability discrimination. *Greenway,* 143 F.3d at 52. The establishment of a prima facie case gives rise to the rebuttable presumption that the employer discriminated against the employee in an unlawful manner. *See id.* (*citing Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997) (*en banc*), *cert. denied,* 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998)). The burden of production then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the employer satisfies this burden, the presumption of discrimination is rebutted. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The plaintiff must then prove, by a preponderance of the evidence, that the defendant's proffered explanation was merely a pretext for discrimination. *See id.; Greenway,* 143 F.3d at 52.

In order to make out a prima facie case under the ADA, Pace must show that "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Heyman v. Queens Village Comm. for Mental Health,* 198 F.3d 68, 72 (2d Cir. 1999) (*citing Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869–70 (2d Cir.1998)). Defendants maintain that Pace has not met prongs (2) and (4)—i.e., neither is he disabled within the meaning of the statute, nor did he suffer an adverse employment action as a result of any disability. Defendants further maintain that even if Pace can establish a prima facie case, Defendants have articulated a legitimate, nondiscriminatory reason for his removal from the Building and Pace has not met his burden of demonstrating that such reason is merely a pretext.

### A. *Pace Has a Disability Within the Meaning of the ADA*

The ADA defines "disability," with respect to an individual, as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

Under EEOC regulations, an individual is substantially limited if he or she is "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or

duration under which [such] individual can perform a particular major life activity" as compared to the average person in the general population. 29 C.F.R. § 1630.2(j)(i)–(ii). "Major life activities" are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* § 1630.2(i). The three factors to be taken into account in the determination of whether an impairment substantially limits a major life activity are: (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long-term impact of or resulting from the impairment. *See id.* § 1630.20(j)(2)(i)–(iii).

 Alcoholism is not a per se disability under the ADA. *See Roberts v. New York State Dep't of Correctional Servs.,* 63 F.Supp.2d 272, 285 (W.D.N.Y.1999) (*citing Burch v. Coca–Cola Co.,* 119 F.3d 305, 316 (5th Cir.1997); *McKey v. Occidental Chem. Corp.,* 956 F.Supp. 1313, 1317 (S.D.Tex.1997)). It is, however, a "physical or mental impairment." *Roberts,* 63 F.Supp.2d at 285. To qualify as an ADA disability, however, Pace's alcoholism must "substantially limit[ ] one or more of [his] major life activities." 42 U.S.C. § 12102(2)(A). Pace has testified at his deposition that during much of his period of alcohol and drug abuse twenty years ago, he did not work. Certainly, then, the inference can be drawn that Pace's alcoholism at that time substantially limited the major life activity of working. Nevertheless, Pace has not had a drink for at least fifteen years, and he has denied, rather emphatically, that his status as a recovering alcoholic has had any effect on his ability to work, or, indeed, on any of his major life activities. Thus, Pace cannot have an ADA-qualifying disability under 42 U.S.C. § 12102(2)(A). *See Roberts,* 63 F.Supp.2d at 285–86; *Stuart v. Danka Corp.,* 986 F.Supp. 741, 744 (E.D.N.Y.1997) (plaintiff, a recovering alcoholic, failed to demonstrate that his disability substantial-ly limited major life activity of working, and therefore failed to demonstrate the existence of a disability under the ADA).

Nevertheless, under 42 U.S.C. § 12102(2)(B), Pace will still qualify as disabled if he has demonstrated that he has a record of his impairment. In this Circuit:

If a person establishes past addiction, ... "recovering addicts, so long as they are not currently using drugs [or alcohol], will automatically be covered under § 12101(2)(B) for having a record of drug [or alcohol] addiction." *Buckley v. Consolidated Edison Co.,* 127 F.3d 270, 273 (2d Cir.1997). In other words, a recovering alcoholic need not show that one or more of his major life activities is currently impaired by alcohol use in order to be protected from discrimination on the basis of his alcoholism.

*Johnson v. St. Clare's Hosp. & Health Ctr.,* No. 96 Civ. 1425, 1998 WL 213203, at *6 (S.D.N.Y. Apr. 30, 1998). Under the relevant EEOC regulations, "has a record of such impairment means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). As Pace testified at his deposition, he has a history of alcoholism which formerly substantially limited his ability to work.

 Defendants contend that Pace's "self-serving" deposition testimony is insufficient, and that without medical evidence of his prior alcoholism, he cannot establish that he has a record of alcoholism. *See Johnson v. St. Clare's Hospital & Health Ctr.,* 96 Civ. 1425, 1998 WL 236235, at *6 (S.D.N.Y.1998) (Peck, Mag. J.). However, neither the ADA nor the EEOC regulations thereunder mention the necessity of medical evidence to establish a "record." Moreover, aside from Magistrate Judge Peck's decision in *Johnson,* no federal court appears to have addressed the question whether medical evidence is required to establish a record of alcoholism. While adoption of such a requirement could provide a tool for courts to

dispose of specious claims brought under the ADA, it could also, in certain instances, force dismissal of otherwise legitimate claims. Pace's testimony, while possibly "self-serving," is admissible evidence, and, under a summary judgment standard, sufficient to establish a record of a disability here.

 Defendants also claim, however, that establishment of a disability under 12102(2)(B) requires, in addition to evidence of a record of a disability, knowledge of that record by the employer. This proposition is not without merit. Section 12102(2)(B) "is intended 'to ensure that people are not discriminated against because of a history of disability.'" *Sweet v. Electronic Data Sys.*, No. 95 Civ. 3987, 1996 WL 204471, at *7 (S.D.N.Y. April 26, 1996) (*quoting* 19 C.F.R. Pt. 1630, App. at 6). *Sweet* held that under § 12102(2)(B), "a plaintiff must show that his employer relied on a record showing the plaintiff's substantially limiting impairment." *Id.* However, the Second Circuit has since made clear that establishment of a disability under § 12102(2)(B) does not require a showing of knowledge on the part of the employer. *See Buckley*, 127 F.3d at 273 (establishment of record of past alcohol or drug addiction *automatically* establishes disability under § 12102(2)(B)).[2]

 For these reasons, Pace has established that he has a disability under § 12102(2)(B).

Pace also claims that he has a disability under § 12102(2)(C). In order to establish a disability under § 12102(2)(C), Pace must demonstrate that he was regarded as having an impairment that substantially limited a major life activity. Under the relevant EEOC regulations:

Is regarded as having such an impairment means:

---

**2.** A plaintiff seeking to establish a prima facie case must still demonstrate knowledge on the part of the employer, however. A plaintiff must show that he or she suffered an adverse employment action because of a disability.

(1) Has a physical or mental impairment that does not substantially limit a major life activity but is treated by a covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has none of the impairments defined [by the EEOC regulations] but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(1).

 "This turns on the employer's perception of the employee, a question of intent, not whether the employee has a disability." *Francis v. City of Meriden*, 129 F.3d 281, 284 (2d Cir.1997). Pace contends that he was perceived by Defendants as having a drinking problem which substantially limited his memory and ability to retain information.

The sole evidence in support of this claim is Galea's remarks to Kemelmacher during the I–EEE Incident, when Galea said, "Don't you know why Emilio forgets? . . . He has a drinking problem." While there is substantial evidence that Galea's comments to Kemelmacher were intended as a joke and perceived as such, because this is a summary judgment motion, the Court is required to construe the facts in the light most favorable to Pace. Pace testified that he did not know whether Galea believed what he said, and Galea has not been deposed. Thus, the comment must be construed as evidence that Galea thought Pace had a drinking problem. Still, this evidence is not sufficient to demonstrate that Galea perceived Pace's impairment to be substantially limiting. Under EEOC regulations,

(1) The term substantially limits means:

As set forth below, if an employer does not know of a disability, such employer cannot take an adverse action against an employee because of the disability.

(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

(2) The following factors should be considered in determining whether an individual is substantially limited in a major life activity:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j).

Galea's comments were made in the context of Pace having forgotten the name of an I–EEE employee. It would be entirely speculative to infer from such evidence that Galea considered Pace's ability to remember to be substantially limited. Moreover, Galea's other actions—following Pace around the Building, asking him whether he vacuumed the leaves, and accusing him of leaving the freight elevator open—fail to demonstrate any evidence that Galea considered Pace to be forgetful, notwithstanding Pace's counsel's wholly speculative and unsupported characterizations to the contrary. The overwhelming testimony of Pace and of the other witnesses deposed in this case is that Galea was a very demanding, difficult, rude, and obnoxious individual who treated everyone in the same manner. Indeed, Galea treated Pace's replacement, Sanford, in exactly the same manner. Nor did Galea ever indicate to anyone at Paris, Pembrook, or CPI that he believed Pace's ability to remember was substantially impaired because of a perceived drinking problem.

There is hardly a scintilla of evidence to suggest that Galea treated Pace in this fashion because Galea perceived Pace to be an alcoholic with a significant memory problem. The evidence from the I–EEE incident is "merely colorable," *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505, and insufficient to defeat a motion for summary judgment.

### B. *Pace Did Not Suffer an Adverse Employment Action as a Result of His Disability*

As set forth above, Pace's disability is based on a record of past alcoholism. Yet no evidence has been put forth to suggest that any of Defendants knew of Pace's record of past alcoholism. Pace's own deposition testimony confirms this. Without knowledge of Pace's disability, it is logically impossible that Defendants removed Pace from the Building as a result of his disability. *See Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 932 (7th Cir. 1995); *Barnett v. Revere Smelting & Refining Corp.,* 67 F.Supp.2d 378, 391 (S.D.N.Y.1999) ("At a minimum, for there to be causation, the employer must have knowledge of the disability."); *Corr v. MTA Long Island Bus,* 27 F.Supp.2d 359, 369 (E.D.N.Y.1998).

Moreover, even if Pace could demonstrate that Defendants had knowledge of his record of past alcoholism, there is no evidence whatsoever to suggest that Pace was removed from the Building as a result of his record of past alcoholism. On the contrary, Pace was removed because he could not get along with Galea, his supervisor. In fact, the record suggests that Pace was not simply "removed," but that Pace himself had made repeated requests to Paris to take him out of the Building because he couldn't stand working under Galea. In any event, on the actual date of his removal, he screamed at Galea at the top of his lungs in response to a question about what had happened with the leaves in the elevator shaft the night before, and

later took issue with Galea's query regarding how long it would take Pace to vacuum the elevators. Whether one characterizes Pace's actions that day as unacceptable insubordination or the legitimate frustrations of a long-term employee fed up with the harassment of a new boss, there is simply no link between the adverse employment action and Pace's record of past alcoholism.

For the same reason, even if Pace were able to demonstrate (which he has not) that he qualified as having a disability under § 12102(2)(C)—i.e., that Galea regarded him as an alcoholic with significant memory problems—Pace would still fail to make out a prima facia case, as he has failed to put forth any evidence that his removal was in any way predicated on such a perception of Galea.

Furthermore, the *only* evidence whatsoever in this case suggesting that the Defendants perceived Pace to suffer from a disability is Galea's comments during the I–EEE incident. This type of isolated, stray remark is insufficient to withstand summary judgment. *See Ellison v. Software Spectrum*, 85 F.3d 187, 192 (5th Cir. 1996) (supervisor's comments to plaintiff, who received radiation treatment for breast cancer, that she should "have a mastectomy because her breasts were not worth saving," and that she "glowed" in the dark, deemed beneath contempt, but not evidence that employer regarded plaintiff as having a substantially limiting impairment); *O'Connor v. Viacom, Inc./Viacom Int'l, Inc.*, No. 93 Civ. 2399, 1996 WL 194299, at *5 (S.D.N.Y. April 23, 1996) (supervisor comparing Irish to criminals and decision maker uttering the work "Mick" on two occasions insufficient to demonstrate a causal nexus to plaintiff's termination), *aff'd*, 104 F.3d 356, 1996 WL 722620 (2d Cir. Dec. 16 1996); *Burrell v. Bentsen*, No. 91 Civ. 2654, 1993 WL 535076, at *8 (S.D.N.Y. Dec. 21, 1993) (stray remarks in workplace, statements by decisionmakers unrelated to decisional process are not by themselves sufficient to satisfy plaintiff's burden of proving pretext), *aff'd mem.*, 50 F.3d 3 (2d Cir.1995); *Ngwu v. The Salvation Army*, Nos. 96 Civ. 0058, 96 Civ. 0059, 1999 WL 2873, at *5 (S.D.N.Y. Jan.4, 1999) (supervisors' comments that "Nigerians came to America and take away their jobs" and calling plaintiffs "fucking Nigerians" insufficient to create inference of national origin discrimination); *Waggoner v. City of Garland*, No. 3:91–Cv–1598–G, 1992 WL 472368 (N.D.Tex. Aug.11, 1992) (comment by supervisor that younger person could do faster work and reference to plaintiff as "old fart" is a mere stray remark and insufficient to withstand summary judgment), *aff'd* 987 F.2d 1160 (5th Cir.1993).

Finally, as mentioned above, Galea treated Pace in the same manner that he treated all of Paris' employees working at the Building. There is no evidence on this record that any of these other employees were alcoholics or had any history of alcohol or substance abuse, or that they were perceived as being alcoholics or having such a history by Galea. There is thus no evidence that Pace was subject to disparate treatment at the hands of Galea.

For these reasons, Pace has failed to make out a prima facie case of disability discrimination under the ADA and these claims must be dismissed.

### C. *Pace Cannot Demonstrate That the Non–Discriminatory Reason for Pace's Removal Was Pretextual*

Even if Pace were able to make out a prima facie case under the ADA, Defendants have articulated a legitimate, non-discriminatory reason for removing Pace from the Building: he had requested to be removed himself, he was experiencing impossible friction with Galea, and he had displayed unacceptable insubordination. Pace has presented no evidence to suggest that these reasons were merely pretextual. As set forth above, nothing in the record establishes any basis for inferring that Pace's removal from the Building was

based on either his record of alcoholism or even on a perception that he was an alcoholic who was substantially limited in his ability to remember. Thus, for this reason as well, Pace's ADA claims must be dismissed.

### III. *The Retaliation Claims Will Be Dismissed*

Pace also alleges that he suffered adverse employment actions because he filed charges with the CCHR.

The ADA prohibits retaliation against an employee who has engaged in statutorily protected activity:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a).

To establish a prima facie retaliation claim under the ADA, a plaintiff must show that: (1) he was engaged in a protected activity; (2) he suffered an employment action disadvantaging him; and (3) there was a causal connection between the protected activity and the adverse employment action. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (*quoting Tomka*, 66 F.3d at 1308); *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996).

Retaliation claims under the ADA are subject to the same three-tiered burden shifting analysis established in *McDonnell Douglas. See Quinn*, 159 F.3d at 768. Plaintiff bears the initial burden of establishing a prima facie case of retaliation by a preponderance of the evidence. If plaintiff meets this initial burden of establishing a prima facie case, defendant must then articulate a legitimate, non-retaliatory reason for the complained action. If defendant meets its burden, plaintiff must then present evidence sufficient to show that

defendant's proffered reason was merely a pretext for impermissible retaliation. *See Quinn*, 159 F.3d at 768–69; *Tomka*, 66 F.3d at 1308–09.

With respect to the first prong, in order to prove that Pace engaged in a protected activity, he "need not establish that the conduct he opposed was in fact a violation of the [ADA]," but only that he possessed a "good faith, reasonable belief that the underlying employment practice was unlawful." *Manoharan v. Columbia Univ. College of Physicians and Surgeons*, 842 F.2d 590, 593 (2d Cir.1988) (citation omitted). Here, the parties do not dispute that Pace engaged in a protected activity by filing discrimination charges with the CCHR in April and July 1997, and that Pace's removal from the Building constituted an adverse employment action disadvantaging Pace. With respect to the third prong, which is disputed, a causal connection "can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Manoharan*, 842 F.2d at 593 (*citing Davis v. State Univ. Of NY*, 802 F.2d 638, 642 (2d Cir.1986)); *see also Valentine v. Standard & Poor's*, 50 F.Supp.2d 262, 290 (S.D.N.Y.1999) (causal nexus established where plaintiff was fired less than two months after filing his charge with the EEOC). In the present case, Pace's removal occurred within weeks after he filed the CCHR charges. Thus, Pace has made out a prima facie case of retaliation.

However, as set forth above in Section II, Defendants have articulated a legitimate, non-retaliatory reason for Pace's removal from the Building: the constant personality conflict between Pace and Galea which led to Pace's insubordination. Moreover, there is absolutely no indication that Pace's filing of charges in April 1997 had anything to do with Pace's removal from the Building. Neither Galea, Pembrook, nor CPI ever mentioned Pace's April 1997 charge. Pace has not met his burden of showing even minimal evidence that the non-discriminatory reason was a

pretext for the retaliatory reason. Thus, Pace cannot survive summary judgment on the retaliation claim for his removal from the Building.

Pace also contends that he suffered a series of subsequent retaliatory actions by Paris when he was shuffled around from building to building, forced to work as a janitor instead of a handyman, and prevented from returning to the Building. Pace contends that this was a deliberate attempt to prevent him from gaining "building seniority" at any one location. Pace further contends that he was fired the instant Paris learned of the result of the union arbitration, and that when he was subsequently reinstated, he was forced to accept a part-time job. Pace alleges that evidence of Paris's retaliatory intent can be shown in Esposito's comment that the instant lawsuit was costing Paris "thousands of dollars."

Paris asserts that, far from discriminating against Pace for filing his claims, it made every attempt to find him a comparable position and keep him employed.

 Here again, the facts construed in the light most favorable to Pace cannot defeat summary judgment. While Pace was engaged in a protected activity and suffered an adverse employment action, the causal connection between the two is more attenuated with respect to these allegations of continuing retaliation because the alleged retaliatory acts do not follow so closely in time the filing of the discrimination charges. The only other evidence of a link is Esposito's comment that Pace was costing Paris "thousands of dollars." This comment, however, was allegedly uttered during a meeting held at the Union to settle Pace's Union grievance. As such, it is inadmissible under Federal Rule of Evidence 408. ("Evidence of conduct or statements made in compromise negotiations is likewise not admissible.") While Pace maintains that the negotiations only pertained to the Union grievance and are thus unconnected to this litigation, this is not the case. The Union grievance goes to exactly the same issue—Pace's attempt to regain his old job at the Building—and its resolution could very likely have ended the instant litigation in an amicable fashion. To the extent that Esposito was attempting to get Pace to understand Paris's position, admission of this evidence would be counter to the public policy of encouraging settlement. *See, e.g., Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758, 770 (10th Cir. 1997) ("Rule 408 does not *require* the exclusion of evidence regarding the settlement of a claim different from the one litigated, though admission of such evidence may nonetheless implicate the same concerns of prejudice and deterrence of settlements which underlie Rule 408.") (emphasis added and citation omitted).

Even if the comment were admissible, and if Pace could make out a prima facie case, Paris has articulated a legitimate, non-discriminatory reason for its actions: Paris agreed to have Pace removed from the Building because Paris had no choice— the client, Pembrook/CPI, through Galea, had informed Paris that Pace could not continue to work at the Building and the only means of rectifying that situation was through a Union grievance—and Paris moved Pace around from building to building not in order to retaliate, but, on the contrary, in an attempt to keep Pace working as much as possible while waiting for the result of the Union grievance arbitration. After learning that Pace had lost the grievance arbitration, Paris placed Pace in the only permanent position it had available at the time for which Pace was qualified.

In addition, as set forth above, Pace was mistakenly fired, was notified of that fact the following day, and did not lose any pay or seniority as a consequence.

Once again, Pace has failed to produce any evidence to rebut Paris's claim, supported by the evidence, that Paris simply sought to accommodate Pace's wishes to the fullest extent possible. For this reason, Pace's retaliation claims must be dismissed.

## IV. *The State Law Disability Claims Will Be Dismissed*

In addition to bringing this action under the ADA, Pace also makes claims under the NYHRL and the New York City Administrative Code, based on the same facts and circumstances as the ADA claims.

The NYHRL states in relevant part that it shall be an "unlawful discriminatory practice" for an employer, because of the disability of any individual, to "discharge from employment such individual or to discriminate against such individual . . . in terms, conditions or privileges of employment." N.Y.Exec.Law § 296(1)(a). The term "disability" is defined as:

> (a) a physical, mental or medical impairment . . . which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory techniques, or (b) a record of such an impairment, or (c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with employment, the term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held.

N.Y.Exec.Law § 292(21).

Pace's claims under the NYHRL fails for reasons similar to those articulated in Sections II and III addressing his ADA and retaliation claims. The same *McDonnell Douglas* burden-shifting analysis applies to NYHRL discrimination claims, whether brought pursuant to the ADA, Title VII, or other federal employment discrimination statutes. *See, e.g., Pace v. Ogden Servs. Corp.*, 257 A.D.2d 101, 692 N.Y.S.2d 220, 223 (3d Dep't 1999). As noted above, Defendants provided legitimate, non-discriminatory reasons for removing Pace from the Building and subsequently moving him around and preventing his return to the Building.

For this reason, his NYHRL claims must fail.

In addition, there is no difference between the rights granted under the NYCHRL and the rights granted under the NYHRL and no difference in "the manner or amount of proof required." *See Buckhout v. New York City Comm'n on Human Rights*, 203 A.D.2d 67, 609 N.Y.S.2d 608 (1st Dep't 1994). Thus, Pace's claim asserted under the NYCHRL must likewise be dismissed.

### *Conclusion*

For the reasons set forth above, summary judgment in favor of Defendants is appropriate with respect to all of Pace's causes of action.

It is so ordered.